Eunice Palmer and Edwina Harvey, Minor, by Eunice Palmer, Her Mother and Best Friend, Appellees, v. Stanley De Filippis et al., Appellants.

Gen. No. 42,152.

Heard in the second division of this court for the first district at the February term, 1942. Opinion filed January 18, 1944. Rehearing denied February 8, 1944.

JOSEPH I. BULGER, of Chicago, for appellants; JOSEPH I. BULGER and HENRY O. NICKEL, both of Chicago, of counsel.

BEN COPPLE, of Chicago, for appellees; MEYER SILVERSTEIN, of Chicago, of counsel.

MR. JUSTICE SCANLAN delivered the opinion of the court.

Eunice Palmer and Edwina Harvey, a minor, by Eunice Palmer, her mother and best friend, filed their complaint against Stanley De Filippis and Angeline De Filippis for personal injuries alleged to have been sustained in an accident. Prior to the trial plaintiffs were given leave "to amend all pleadings and records of the court in the above entitled cause on their face instanter, so that the title of the defendants shall read Angeline Albergo instead of Angeline De Filippis. Thereupon the Court appoints Angeline Albergo as guardian ad litem for the minor defendant, Stanley De Filippis." The case was tried by the court without a jury.

The complaint, consisting of four counts, charges each of the defendants with general negligence, specific acts of negligence, and wilful and wanton conduct

in the operation of the automobile that struck and injured plaintiffs.

At the conclusion of the evidence the trial court entered a judgment finding defendants guilty, and further finding:

"From the evidence adduced herein, the court finds the defendant, Stanley De Filippis, guilty of wilfully and wantonly committing the acts which proximately caused the injuries of plaintiff, Eunice Palmer, as alleged in his complaint and that malice is the gist of the action herein.

"Therefore it is considered by the court that malice is the gist of the action as to the defendant Stanley De Filippis.

"Therefore it is considered by the court that the plaintiff, Eunice Palmer do have and recover of and from the defendant, Stanley De Filippis and Angeline Albergo, her said damages of Three Thousand Dollars in form as aforesaid by the court assessed.

"It is further considered by the court that the plaintiff, Edwina Harvey, a minor suing herein by Eunice Palmer, her mother and best friend, do have and recover of and from the defendants Stanley De Filippis and Angeline Albergo, her said damages of One Thousand Dollars in form as aforesaid by the Court assessed together with their costs and charges in this behalf expended and have execution therefore. . . ."

Defendants appeal from the judgment entered.

The first contention is that "the evidence does not sustain the court's finding that the defendant, Stanley De Filippis, was guilty of wilfully, wantonly and maliciously injuring the plaintiffs."

Eunice Palmer, a plaintiff, testified that she was thirty-four years old and that Edwina Harvey, a plaintiff, is her daughter; that on March 10, 1941, at about 4:30 p. m., she and her daughter were walking in an easterly direction on the north side of Madison street and that when they reached Washtenaw avenue they

crossed that street; that they then started to cross Madison street at the east crosswalk of Madison street and Washtenaw avenue; that before they started to cross Madison street they saw the automobile in question at California avenue, which is one block west of Washtenaw; that at the time of the accident they were in the east crosswalk between the east and west bound street car rails and they were walking fast; that she heard a horn, looked up, and saw the automobile in question about ten feet from them; that it was coming very fast, about forty-five miles per hour; that she attempted to throw Edwina out of the path of the car but it struck them both; that the car did not slow down nor swerve and that the front bumper of the car struck her and threw her about fifteen feet in front of the car; that Edwina was thrown to the right of the car and after the contact both of them were lying in the street car rails; that while she was lying on the ground she raised herself partly and saw the car in question stop on Madison street about half a block away from the crossing. Upon cross-examination she testified that when she first saw the automobile in question it was about a block away; that there was no traffic on the street going either west or east and she had a clear view of the street; that she looked both ways before crossing and saw this car a block away; that it had been raining all day and the pavement was wet; that there were no cars double parked on either side of Madison street; that she heard the car tooting its horn when it was about ten feet away from them; that the car did not slow down and it was going very fast; that she was then in the center of the street; that she jerked her daughter away in an attempt to save her.

Edwina Harvey, a plaintiff, testified that she was fourteen years of age and a high school student; that she and her mother were walking east on the north side of Madison street and they crossed over to the east side of Washtenaw; that she looked in both direc-

tions before crossing Madison street and saw the automobile in question about a block away; that she was walking with her mother across Madison street on the east pedestrian walk on Washtenaw avenue when the car struck them; that it was going very fast; that her mother pulled her to one side but the car struck her anyway; that she first saw the car when it was about a block away, coming from the west, as they were about to cross Madison street; that there was nothing in front of the car and she had a clear view from the corner; that she next saw the car when it was about fifteen feet from them; that she and her mother were then about in the middle of the street between the east and west bound rails; that she heard the car sound its horn; that the car did not stop after it struck them but went for about a half a block before stopping. Upon cross-examination she testified that before they started across Madison street going south she looked both ways and there was no traffic going either way on Madison street; that the car was about a block away and there were no trucks or cars in front of it; that it was raining hard that day and the street was very wet.

Plaintiff also introduced a statement made by Stanley De Filippis to the police about half an hour after the accident. In that statement he stated that he was eighteen years of age and a high school student; *that he had been driving an automobile for nine years;* that his mother, Angeline De Filippis, owned the car in question; that he had been driving that car for four years; that just before the accident he was driving east on Madison street at fifteen to twenty miles per hour; that the street was wet; that there were no obstructions. "Q. Now go ahead in your own way and tell how the accident happened, and all you know about the case? A. I was driving my mother's car east on Madison Street. As I approached Washtenaw Ave. I was driving about 15 to 20 miles per hour. *When my car*

*still half a block west of Washtenaw Ave. I saw a woman and a young girl walking south across Madison Street.* They were crossing in the middle of the block. They were about the middle of Madison Street when I first saw them and my car was about 5 feet from them. I stepped on the brakes and blew the horn. My car skidded on the bricks. The left front of my car struck them and knocked them down. I stopped my car after I had pulled to the curb. The Police arrived and took them to the hospital. Q. With reference to this accident, how far did your vehicle go after the accident before coming to a complete stop? A. About 5 feet. .Q. How far was this person away when .you first observed her? A. About 5 feet. Q. Was anyone with you at the time of the accident? A. Yes. My mother and one sister & 2 brothers. Q. Were there any other automobiles on the street at this place at the time of the accident? A. No. Q. What was the condition of your brakes (foot or emergency) at the time of the accident? A. Very good. Q. How was the visibility, how far could you see ahead, right or left? A. Good. About one block ahead. R & L to the parked cars. Q. Did you have anything intoxicating to drink prior to the accident? A. No. Q. Is there anything else you would like to say? A. Nothing else.'' (Italics ours.) Stanley was called by plaintiffs to testify under Section 60 of the Civil Practice Act. He testified that he started to drive east on Madison street in Oak Park; that his mother and two brothers were sitting in the back seat and his sister Rosetta was sitting in the front seat with him; that there were trucks and cars parked ·along the curb on the south side of Madison street and at some places they were double parked; that in the middle of the block between California avenue and Washtenaw avenue he ''went over to the center of the street between the street car rails,'' and that he was in second gear when he approached Washtenaw avenue; that *''I saw some*

*women when I was a half a block away from Washte-*
*naw and Madison Street. They were walking South*
*on the East crosswalk of Washtenaw and Madison*
*Street.* I was going about fifteen miles per hour. I
saw these women when they were about fifteen feet in
front of me when I came to the intersection of Washte-
naw and Madison Street. The left side of the car was
between the East and West bound street car tracks.
They were in the middle of the street. I tooted my
horn and put my brakes on. I did not turn my car.
I couldn't because cars were double parked on my
right. I skidded. It was impossible to avoid the acci-
dent. When I first saw the plaintiffs they were in the
middle of the street between East and West bound
tracks about ten feet away. A large truck three feet
in front obstructed my view. . . . I was looking
straight ahead of me. There was nothing obstructing
my view. I tooted my horn when I approached Wash-
tenaw.'' (Italics ours.) When this defendant was
called as a witness in his own behalf he gave a new
version of the accident, *viz.,* that when plaintiffs were
walking south he saw them look toward his car about
the time he tooted his horn and saw them turn around
to go north and then turn once again and run south
into the path of the automobile he was driving; that
there was traffic going east; that they came from be-
hind an automobile; that a street car was coming from
the east going west. Upon cross-examination he ad-
mitted that when he was first called as a witness in
the trial he had testified that he saw the women when
he was about half a block away from Washtenaw ave-
nue, and he further admitted that there was no traffic
nor cars ahead of him. ·

Rosetta De Filippis, the sister of Stanley, testified
that she was riding in the front seat with her brother;
that it was raining at the time but the windshield
wipers were working; that she could see in front of
her and she saw two ladies walking south at Washte-

naw and Madison street when the car was about fifteen feet away; that they were about in the middle of the street between the east and west bound street car tracks; that her brother tooted the horn and put on the brakes and skidded about five feet when the women were struck; that the car was going about fifteen miles an hour and it came to a stop immediately after the collision; that there were cars parked on both sides of the street at the curb; that when plaintiffs were about in the middle of the street and walking south they looked toward the car in which she was riding and looked east and then turned around to go north and turned again to go south, at which time the car reached them. Upon cross-examination she testified that she had a clear view ahead of her and that when she first saw plaintiffs they were twenty to twenty-five feet east of the car.

Anthony De Filippis, the brother of Stanley, testified that he was sitting in the back seat with his mother and other brother and did not see the accident.

Angeline De Filippis Albergo, the mother of Stanley, testified that she owned the car in question but that she did not drive an automobile; that she did not see the accident but heard Stanley toot his horn when near Washtenaw, heard him apply the brakes and that the car was going very slow at the time of the accident.

This case was tried by an experienced judge, who saw and heard the witnesses, and he believed the testimony of the two plaintiffs as to how the accident happened. He refused to believe the last testimony given by Stanley De Filippis, that just before the collision plaintiffs came from behind an automobile, looked up and saw his car and then turned to go north and then turned once again and ran south into the path of the automobile. Neither in a statement to the police immediately after the accident nor in his testimony when he was first called as a witness under Section 60 of the Civil Practice Act did Stanley make any such

claim. In this connection it must be noted that when he made his statement to the police he was asked the following question: "Q. Now go ahead in your own way and tell how the accident happened, and all you know about the case?" and that in answer to this question he made no mention of any fact that would tend to support his last testimony as to how the accident occurred. Moreover, at the close of his interrogation by the police the following occurred: "Q. Is there anything else you would like to say? A. Nothing else." The trial court was fully justified in finding that Stanley saw plaintiffs crossing the street at the east crosswalk of Washtenaw avenue and Madison street when he was a block away, or at least half a block away; that plaintiffs had the right of way and that it was Stanley's duty to afford them a reasonable opportunity to cross the intersection; that instead of doing so he wilfully and recklessly drove the automobile over the intersection at an excessive rate of speed, and failed to keep his machine under such control as to enable him to avoid the accident; that he knew that the pavement was very wet and slippery. The amazing fact appears that Stanley's mother has used him to drive a car for her since he was nine years of age. The court was fully justified in believing that the claim he finally made as to the actions of plaintiffs just before the collision was false and a mere afterthought.

In *Fickerle v. Seekamp,* 274 Ill. App. 310, we said (pp. 318, 319): "Our Supreme Court has frequently stated that it is difficult if not impossible, to lay down a rule of general application by which to determine what degree of negligence the law considers equivalent to a wilful and wanton act.

" 'Courts have recognized the difficulty of accurately stating under what circumstances a defendant may be held guilty of wilful and wanton misconduct in causing an injury. Such conduct imports consciousness that an injury may probably result from the act done and

a reckless disregard of the consequences.' (*Brown v. Illinois Terminal Co.,* 319 Ill. 326, 331.)

" 'Whether the negligent conduct of a defendant which has resulted in injury to another amounted to wantonness is a question of fact to be determined by the jury, if there is any evidence in the record fairly tending to show such a gross want of care as indicates a willful disregard of consequences or a willingness to inflict injury.' (*Walldren Express Co. v. Krug,* 291 Ill. 472, 476. See also *Jeneary v. C. & I. Traction Co.,* 306 Ill. 392, 397.)"

In *Jenkins v. Goodall,* 183 Ill. App. 633, where the facts were somewhat similar to the facts in the instant case, the court said (pp. 636, 637):

"He saw plaintiff in the center of the street attempting to cross. He could have checked his speed and prevented striking her. By sounding the horn he expected her to stop and remain in the center of the street, until he passed. The evidence fairly establishes the rate of speed he was going to be at least fifteen miles an hour. And he was thirty-five or forty feet from her when he sounded the horn. He made no effort to check his speed until he was within five or six feet of her. Ordinary care certainly required more than that. He relied on her to exercise all the judgment and care necessary to prevent injury, while he in the management of a powerful, swift moving machine assumed superior rights to the use of the street as against ones attempting to cross it. He was required under the circumstances to keep a proper lookout for persons on or about to cross over said street and keep his machine under such control as to enable him to avoid collision and if necessary to prevent injury to stop. *Kessler v. Washburn,* 157 Ill. App. 532; *Johnson v. Coey,* 237 Ill. 88." (See, also, *Fickerle v. Seekamp, supra.*)

In the instant case the driver of the car testified that he sounded his horn when he was within fifteen feet of

plaintiffs. In the *Fickerle* case we stated (p. 320): "It is undisputed that the only time he sounded his horn was when the truck was within 15 feet of the deceased. It would be idle to argue that sounding the horn at that time, in view of the speed at which the truck was being driven, was a reasonable warning of its approach. Such a warning, under the circumstances, would be more likely to frighten and confuse the deceased than to aid him, whereas, had the horn been sounded in reasonable time the deceased could have avoided the onrushing truck."

There were no stop lights at the intersection in question.

Section 74 of the Uniform Act Regulating Traffic on Highways, par. 171, of the Motor Vehicles Act (ch. 95½, Ill. Rev. Stat. 1943 [Jones Ill. Stats. Ann. 85.203]), provides, *inter alia*:

"(a) Where traffic control signals are not in place or in operation the driver of a vehicle shall yield the right-of-way, slowing down or stopping if need be to so yield, to a pedestrian crossing the roadway within any marked crosswalk or within any unmarked crosswalk at an intersection, except as otherwise provided in this article."

In the instant case the evidence shows conclusively that plaintiffs had the right of way at the time in question. The trial court found that defendant Stanley De Filippis was guilty of wilful and wanton conduct which caused the injuries to plaintiffs, and we approve of that finding.

Defendants next contend that the "damages awarded the plaintiffs are not supported by competent evidence and are excessive." The trial court awarded Eunice Palmer $3,000. She testified that as a result of the collision she sustained a fractured nose, two cracked ribs, two black eyes, a broken leg, a tear in the right knee which required seventeen stitches, and a lacerated left shin bone, cut three inches long, and that

she still suffers pain in the leg which was fractured; that she sustained expenses in connection with her injuries; that she was in a hospital for five days and her leg was placed in a plaster cast; that she was compelled to remain at home for nineteen weeks and to use crutches in order to get around; that her doctor came to the house about four times and after that she went to his office about once a week; that she had a practical nurse to care for her and her daughter and paid her fifteen dollars per week; that after the accident she and her daughter were taken to the Presbyterian hospital in a police ambulance; that X-rays were taken at the hospital; that because of the pains in her leg she sometimes has difficulty in walking; that her ankle swells up at times; that she paid the Presbyterian hospital thirty dollars on her own account and nineteen dollars on account of her daughter; that she has only partly paid the doctor's bill. The trial court awarded Edwina Harvey $1,000 damages. She testified that she sustained a fractured leg, which was kept in a cast for five weeks, and that she was compelled to use crutches for seven weeks; that the doctor came to see her at the home several times, after which she went to his office in a taxicab. The principal point made by defendants in support of the instant contention is that plaintiffs failed to call a doctor to testify as to their injuries, that to determine the amount of the damages actually sustained medical testimony was essential, and that the damages awarded by the trial court were based upon guesses and speculation. It appears from the record that after Eunice Palmer had testified that she had received "a fractured nose, two cracked ribs, two black eyes, a broken leg, a tear in the right knee which required seventeen stitches, lacerated left shin bone, cut three inches long," an objection was made by defendants' attorney to the questions and answers as to the said injuries "*on the ground that the same is hearsay and not the best evidence and self-serving*

*statement.''* This objection was overruled. In support of the instant contention *Rose v. Chicago City Ry. Co.,* 207 Ill. App. 345, is cited. There it was held that in a personal injury action the opinions of medical experts are essential for the guidance of a jury as to alleged infections, their causes and progress, as such matters left to the guesses of the uninformed would make possible damages based solely on speculation and not upon evidence. No question of damages akin to infections was here involved. The law does not require that plaintiffs in every personal injury case produce a doctor to testify as to injuries alleged to have been sustained. Nor did defendants contend at the time of the introduction of the testimony in question that it was necessary for plaintiffs to produce medical experts to testify as to their injuries. It is customary for plaintiffs in injury cases to testify as to injuries they claim they received. If the instant contention of defendants is sound, then if a plaintiff lost an arm or a leg in an accident he would be compelled to call a doctor to testify to that fact. Defendants complain that the trial court allowed Eunice Palmer to testify that the hospital took X-rays; but the witness did not attempt to state what the X-rays showed, and there is no merit in the complaint. The amount of damages fixed by the trial court was fully justified by the evidence. Indeed, plaintiffs might well complain that the damages awarded are inadequate.

We are satisfied that the contention made that plaintiffs were guilty of contributory negligence is without the slightest merit.

The last contention is that "the court owes a duty to see to it that minors are properly represented and their rights and interests are safeguarded." Defendants concede that an appearance and answer were filed in behalf of Stanley De Filippis, a minor and a defendant, by Attorney Joseph I. Bulger, and that plaintiffs, prior to the hearing of evidence, made a motion, which

was allowed by the court, appointing Angeline De Filippis Albergo, Stanley's mother, guardian *ad litem* for Stanley De Filippis, a minor. The record affirmatively shows that neither the guardian *ad litem* nor Mr. Bulger made any objection or suggestion in reference to the motion. But Mr. Bulger, who acts in this court for Stanley De Filippis, a minor, and Angeline De Filippis Albergo, guardian *ad litem* for Stanley De Filippis, a minor, and Angeline De Filippis Albergo, states that the record fails to show that any motion was made by plaintiffs or the court that the answer previously filed in behalf of the minor by Mr. Bulger be amended or adopted as the answer of the newly appointed guardian *ad litem* for and on behalf of herself as such or in behalf of the minor, and the record fails to show that plaintiffs made any motion to appoint counsel for the guardian *ad litem,* and that this procedure left the guardian and the minor without a proper answer to the complaint, and, *"technically speaking,* without counsel." The record fails to show that the guardian *ad litem* or Mr. Bulger' made any motion or suggestion to the court that counsel be appointed for the guardian *ad litem* or that Mr. Bulger made any objection to proceeding with the cause in the then state of the pleadings. The record shows that before the trial, and during the trial, Mr. Bulger represented Stanley De Filippis, a minor, and that upon this appeal he also represents the guardian *ad litem.* Indeed, in the notice of appeal Mr. Bulger signs himself as the attorney for the guardian *ad litem* of Stanley De Filippis, a minor. When Stanley De Filippis was called as a witness on behalf of plaintiffs under Section 60 of the Civil Practice Act Mr. Bulger objected to his being called as a witness. He called Stanley as a witness in his own behalf and examined him. Acting for Stanley Mr. Bulger made a motion to dismiss the counts in the complaint that charged wilful and wanton misconduct by Stanley on the

ground that the evidence was insufficient to sustain the charges. Counsel fails to point out where any substantial right of the minor was impaired in the proceedings in the trial court. If there had been a formal order entered that the answer filed by Mr. Bulger was adopted as the answer of the guardian *ad litem* the minor would have had no greater right than he had throughout the trial in making his defense. Had the trial court entered an order appointing an attorney for the guardian *ad litem* he would have undoubtedly appointed Mr. Bulger. Mr. Bulger is an able and experienced lawyer and he does not contend nor suggest that in the defense of the cause he was handicapped in any way by the fact that the court did not formally appoint him attorney for the guardian. Had the trial court, without the consent of the guardian *ad litem,* appointed an attorney for the guardian *ad litem* other than Mr. Bulger, the guardian *ad litem* might then have had some cause for complaint, especially if her interests were not fully protected in the trial of the case by the attorney appointed by the court. As to the contention that the record fails to show that the answer in behalf of Stanley De Filippis, a minor, was formally adopted as the answer of the guardian *ad litem,* it is sufficient to say that the guardian *ad litem,* through Mr. Bulger, appears to have been satisfied to have the case tried upon the answer as it then stood, and the instant contention now raised for the first time will not avail her. Defendants cite three cases in support of their contention, *Peak v. Pricer,* 21 Ill. 164, 165; *Bellchambers v. Ebeling,* 294 Ill. App. 247, 255, and *Millage v. Noble,* 334 Ill. 315, 320, 321.

In *Peak v. Pricer* it appears that Peak was a minor and that the court appointed W. E. Nelson his guardian *ad litem,* who filed pleas for his ward. Nelson was an attorney and he entered his appearance as attorney for Shasted, the other defendant, and on the same day "pleas were withdrawn by *agreement of parties,* and judgment was entered against the defendants."

The pleas that were filed on behalf of the minor were non assumpsit and infancy. The minor sued out a writ of error and claimed that the trial court suffered the guardian *ad litem* of plaintiff in error to withdraw the pleas that had been filed in his behalf and to agree to a judgment against him. The Supreme Court held (p. 165) : "After the guardian was once appointed, and until he was discharged or removed by order of the court, the defense could only be conducted by him, and it became his duty to make a proper defense for the infant, and also the duty was imposed on the court to see that such defense was made, or, at least, to see that some defense was made. It was error, therefore, for the court to allow the plea which had been filed by the guardian, to be withdrawn by him, and to render a judgment by default against the infant." No such situation is present in the instant case and the rule announced by the Supreme Court is a wholesome one that prevents guardians *ad litem* from abandoning the defense in suits against minors.

*Bellchambers v. Ebeling* states the general rule that the appointment of a guardian *ad litem* is necessary in order to protect the interests of a minor in the trial of a cause and that when the trial court does not appoint a guardian *ad litem* for a minor defendant at the proper time the error may be availed of on appeal for the first time, and if the error be of such serious nature as to justify reversal there could be no complaint because the objection was not included as one of the errors in defendant's motion for a new trial. In that case the guardian *ad litem* was not appointed until after the trial of the cause and just before the trial court overruled the defendant's motion for a new trial.

In *Millage v. Noble* the court states (pp. 320, 321) : "When the interests of an infant are called to the attention of the court and the infant himself has been brought into court he becomes the ward of the court, and it is the latter's duty to see that his rights are properly protected. If the general guardian who un-

dertakes the performance of this trust, or a guardian *ad litem,* fails to properly protect the interest of his ward, it is the duty of the court to compel him to do so, or if for any reason he can not act in that capacity he should withdraw and another guardian should be appointed. (*Tymony v. Tymony,* 331 Ill. 420; *Rhoads v. Rhoads,* 43 id. 239; *Reddick v. State Bank,* 27 id. 145; *Sconce v. Whitney,* 12 id. 150; *Hitt v. Ormsbee,* id. 166; *Enos v. Capps,* id. 255.) The interests of the minor, Lester Hudson, were not properly represented in the trial court, and we cannot pass upon the merits of the case concerning his rights in the present condition of the record. *Linebaugh v. Atwater,* 173 Ill. 613.'' In that case it appears that the guardian *ad litem* had been appointed guardian for two incompetent persons whose interests were antagonistic, and the Supreme Court held, of course, that another guardian should have been appointed for Lester Hudson.

No case has been cited by counsel for the guardian *ad litem* that holds that where a trial court appoints a guardian *ad litem* he must also, regardless of the situation, appoint an attorney for the guardian *ad litem.* The guardian *ad litem* had the right to ask the court to appoint counsel and it was her duty to do so if she deemed it necessary. (22 Cyc. 665.) In the instant proceeding, the trial court had a right to assume that Mr. Bulger would, in fact, represent the guardian *ad litem* and that he was well able to fully protect the rights of said guardian. Mr. Bulger does not and would not contend that he did not ably and fully protect the rights of the guardian *ad litem* and the minor, but he merely argues that they were, *"technically speaking,* without counsel.''

Defendants have had a fair trial and the judgment entered in this cause and the special finding of the trial court are affirmed.

*Judgment and special finding affirmed.*

FRIEND, P. J., and SULLIVAN, J., concur.